FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Sep 12, 2022

SEAN F. McAVOY, CLERK

Vanessa R. Waldref
United States Attorney
Eastern District of Washington
Dan Fruchter
Tyler H.L. Tornabene
Assistant United States Attorneys
Post Office Box 1494
Spokane, WA 99210-1494
Telephone: (509) 353-2767

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.:  **2:22-CR-00123-RMP** |
| Plaintiff, | INFORMATION |
| v. | Vio: 18 U.S.C. § 371; 42 U.S.C. § 1320a-7b(b) |
| CHRISTOPHER BRENT BJARKE, M.D., | 18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461(c) |
| Defendant. | Forfeiture Allegations |

The United States Attorney charges:

<u>General Allegations</u>

*Medicare and Coverage for Diagnostic Laboratory Testing*

1.     Medicare is a federal health care benefit program that provides health insurance to elderly and disabled citizens in the United States.  Medicare provides health insurance coverage for eligible health care services including hospital services, outpatient services, medical equipment, prescription drug costs, and certain types of diagnostic laboratory testing.

2.     Medicare covers diagnostic laboratory testing only if such test is reasonable and necessary for the diagnosis or treatment of illness or injury.  In

INFORMATION

1  order to be considered reasonable and medically necessary, clinical laboratory

2  services must be ordered and used promptly by the physician who is treating the

3  beneficiary for a specific medical problem and who uses the results in the

4  management of the beneficiary's specific medical problem.  Tests not ordered by

5  the physician who is treating the beneficiary are considered not reasonable and

6  necessary and therefore not reimbursable under Medicare.

7      3.     Defendant is a licensed physician in Washington State.  During the

8  time period relevant to this Information, Defendant resided in Renton, Washington.

9      4.     Between on or about October 26, 2020, and continuing thereafter until

10  on or about July 30, 2021, in the Eastern District of Washington and elsewhere, the

11  Defendant, CHRISTOPHER BRENT BJARKE, knowingly and willfully conspired

12  and agreed with other persons both known and unknown, to violate the Anti-

13  Kickback Statute, 42 U.S.C. § 1320a-7b(b), by knowingly and willfully soliciting

14  and receiving remuneration in return for referring individuals to persons for the

15  furnishing or arranging for the furnishing of items and services for which payment

16  was in whole or in part under a Federal health care program, to wit, the Medicare

17  program.

18  MANNER AND MEANS OF THE KICKBACK SCHEME AND CONSPIRACY

19      5.     It was part of the conspiracy that on or about October 26, 2020,

20  Defendant executed a "Physician Independent Contractor Agreement" with a

21  company, referred to hereinafter as Company A, to provide contracted physician

22  telemedicine services in support of certain types of genetic laboratory testing.

23  Company A in turn arranged with a telemedicine company known as Company B

24  to provide contracted physician services, including Defendant's services, in

25  support of Company B's attempts to market genetic testing and other types of

26  telemedicine services.  Company B provided a list of criteria to Defendant for

27  determining whether an individual qualified for genetic testing.

28

INFORMATION

5.     As a further part of the scheme and conspiracy, Company B arranged with various telemarketing companies to contact by telephone elderly Medicare beneficiaries.  The Medicare beneficiaries were told by the telemarketing company representatives that they qualified for cardiac genetic testing or other types of genetic testing, which would provide valuable information about the beneficiaries' cardiovascular health by determining whether they were at genetic risk for cardiovascular disease and events.  Beneficiaries were further informed by telemarketing representatives and Defendant that Medicare would cover the entire cost of the testing, such that there would be no out-of-pocket cost to them.  The telemarketing companies took information from beneficiaries regarding their personal and family history with cardiovascular disease, including whether they or any of their family had high blood pressure, high cholesterol, or had suffered a heart attack, stroke, or other cardiac event.

6.     As a further part of the conspiracy, once the telemarketing companies had obtained this family and personal information from beneficiaries, the companies informed the beneficiaries that they would need to speak briefly to a physician, promised the beneficiaries it would only take one to three minutes, and then connected beneficiaries by phone with either Defendant or a different available physician through a web-based application.

7.     As a further part of the conspiracy, during a brief telephone conversation that typically took between approximately three and four minutes, Defendant would confirm a beneficiary's personal and family history with cardiovascular disease.  Defendant, using criteria provided by Company B, approved cardiovascular genetic testing for nearly every beneficiary with whom he spoke for the cardiovascular genetic testing.  Other than applying the criteria provided by Company B against the patient's self-reported history provided to Company B and confirmed by Defendant with the beneficiary, Defendant did not

INFORMATION

exercise any independent medical judgment regarding whether the beneficiary needed or could benefit from cardiovascular genetic testing. Defendant did not review any medical records or documentation other than the beneficiary's self-reported family history and self-reported medication list as taken by the telemarketing company. Defendant did not take any vital signs of any beneficiaries, nor did Defendant observe, remotely or otherwise, the beneficiary or establish a bona fide physician-patient relationship. Defendant's discussion with the beneficiary was limited to applying Company B's criteria for determining whether a beneficiary was qualified for the cardiovascular genetic testing and did not include any other medical information or discussion of the beneficiary's health condition or any health problems or concerns.

8.      As a further part of the conspiracy, in order to convince some beneficiaries to agree to the test, and consistent with direction provided by Company B, Defendant frequently advised beneficiaries that the genetic testing results could be helpful for the beneficiaries' children or grandchildren.

9.      As a further part of the conspiracy, Defendant asked beneficiaries whether they had any questions about the genetic test, and whether they would agree to it. If beneficiaries agreed to the test, Defendant electronically approved it in the electronic health record system.

10.     As Defendant knew, and as a further part of the conspiracy, Company B's system, in turn, automatically applied Defendant's electronic signature to separately generated documentation that falsely stated that the test was medically necessary under Medicare guidelines and that it would be used to make decisions regarding the patient's care. While the wording of these certifications varied slightly, Defendant's electronic signature appeared on Company B documents entitled "Certificate of Medical Consultation" falsely stating that "[t]he result of this genetic test will have a direct impact on the patient's treatment and

INFORMATION

management," and that "[k]nowledge of this patient's cardiac genetic information . . . will guide my recommendations for care."

11.    The purpose of these false certifications was to make it appear as though the testing was appropriately ordered and eligible for Medicare reimbursement.  As a further part of the conspiracy, once the documentation had been assigned Defendant's signature, beneficiaries received a test kit in the mail from a genetic testing lab, which they would use to perform a buccal swab (i.e., a cheek swab using a cotton swab) and then mail the DNA sample back to the testing lab.

12.    As a further part of the conspiracy, after the genetic testing lab received the sample, the lab billed Medicare sometimes as much as tens of thousands of dollars for each test and identified Defendant as the "referring physician" who had ordered the test.  For each beneficiary, whether or not the test was performed, Company B also separately requested reimbursement from Medicare for a "patient visit" for the phone conversation that took place between Defendant and the beneficiary, listing Defendant as the "referring provider."  In a limited number of instances, multiple versions of the same cardiovascular genetic test were ordered, and multiple "visits" fraudulently billed by Companies A and B, for the same beneficiary.

13.    Defendant knowingly participated in this scheme and conspiracy with respect to dozens of beneficiaries residing and located in the Eastern District of Washington, as well as beneficiaries in the Western District of Washington, and in other states in which Defendant was licensed to practice medicine.

14.    None of the cardiovascular testing ordered by Defendant was medically necessary or reimbursable under Medicare, because, among other things: Defendant was not treating any of the beneficiaries for any medical issues; Defendant did not have or establish a bona fide physician-patient relationship with

INFORMATION

any of the beneficiaries with whom he spoke; Defendant never used any of the results of the testing in the treatment of any beneficiaries; Defendant did not make a meaningful or reasonable diagnosis of medical necessity for any of the patients using independent medical judgment; and Defendant was being paid a kickback for each genetic test he approved.

15.    As a further part of the conspiracy, in return for his participation in the scheme described above, Defendant received approximately $24 for each beneficiary phone conversation, which typically took between three and four minutes of Defendant's time.

16.    Billing data from Medicare indicates that during the relevant time period, through Defendant's participation in the scheme, Medicare paid more for genetic tests than for any physician billing Medicare in Washington and paid the fifth highest amount nationally for genetic tests ordered by Defendant.  Billing data from Medicare indicates that in total, more than 8,500 claims on behalf of 5,593 Medicare beneficiaries for genetic tests and physicians were falsely and fraudulently billed to Medicare by test labs and Company B based upon Defendant's approvals as the ordering physician, resulting in payment of $18,657,310 in improperly and fraudulently obtained Medicare funds.

17.    The overwhelming majority of these payments were shared only between Defendant's co-conspirators.  However, between in or around December 2020 and in or around September 2021, Defendant received at least $167,996.73 as his personal compensation for his participation in the scheme.  These payments were kickbacks in violation of 42 U.S.C. § 1320a-7b(b) in that Defendant received them in return for his ordering and referring medically unnecessary genetic testing.

## OVERT ACTS

18.    The allegations set forth above in paragraphs 1 through 17 are realleged and incorporated herein.

INFORMATION

19.    In furtherance of the conspiracy and to effect the objects of the conspiracy, the following overt acts, among others, were committed in the Eastern District of Washington, and elsewhere:

(a)    on or about October 26, 2020, Defendant executed a "Physician Independent Contractor Agreement" with a company, referred to hereinafter as Company A, to provide contracted physician telemedicine services in support of certain types of genetic laboratory testing.

(b)    As further set forth above, Defendant referred and ordered medically unnecessary genetic testing to be billed to Medicare for thousands of beneficiaries, including dozens of beneficiaries residing in the Eastern District of Washington. For each of these beneficiaries, Defendant solicited and received a kickback in the form of monetary remuneration in return for ordering the test or other service. Defendant's conduct resulted in Medicare being billed for and paying approximately \$18,657,310 for medically unnecessary genetic testing and other items and services ordered and referred by Defendant between October 26, 2020 and July 30, 2021.  Defendant received approximately \$167,996.73 in kickbacks as his personal compensation for his participation in the scheme and conspiracy. All in violation of 18 U.S.C. § 371; 42 U.S.C. § 1320a-7b(b).

## NOTICE OF FORFEITURE ALLEGATIONS

The allegations contained in this Information are hereby re-alleged and incorporated herein by this reference for the purpose of alleging forfeitures.

Pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), upon conviction of an offense in violation of Conspiracy to Violate the Anti-Kickback Statute, in violation of 18 U.S.C. § 371, 42 U.S.C. § 1320a-7b(b), as alleged in this Information, Defendant CHRISTOPHER B. BJARKE, M.D., shall forfeit to the United States any property, real or personal, which constitutes or is derived from

INFORMATION

proceeds traceable to the offense.  The property to be forfeited includes, but is not limited to, the following:

MONEY JUDGMENT

A sum of money equal to $167,996.73 in United States currency, representing the amount of proceeds obtained by the Defendant as a result of his illegal conduct.

If any of the property described above, as the result of any act or omission of Defendant:

 (a) cannot be located upon the exercise of due diligence;

 (b) has been transferred or sold to, or deposited with, a third party;

 (c) has been placed beyond the jurisdiction of the court;

 (d) has been substantially diminished in value; or

 (e) has been commingled with other property which cannot be divided without difficulty,

the United States shall be entitled to forfeiture of substitute property pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

Dated this 12th day of September, 2022.

Vanessa R. Waldref
United States Attorney

Dan Fruchter
Assistant United States Attorney

Tyler H.L. Tornabene
Assistant United States Attorney

INFORMATION